**The below described is SIGNED.**

(kxp)

**Dated: October 24, 2007** _____
_William J. Thurman_
**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number:  07-23193 |
| **Darin L. Burt,** | Chapter 13 |
| Debtor. | |

### MEMORANDUM DECISION

The matter before the Court is Ford Motor Credit Company, LLC's ("Ford Motor Credit") objection to confirmation of the Debtor's proposed chapter 13 plan.  Ford Motor Credit objects to confirmation on the basis that the Debtor's proposed plan seeks to improperly cram down Ford Motor Credit's secured claim in violation of 11 U.S.C. §1325(a)(*), otherwise referred to as the "hanging paragraph."  The Debtor filed a response to Ford Motor Credit's objection and a separate objection to Ford Motor Credit's proof of claim, arguing that §1325(a)(*) does not apply to Ford Motor Credit's claim because it does not hold a purchase money security interest ("PMSI") in the 2006 Ford F-150 truck (the "Truck" or "vehicle").  Specifically, the Debtor argues that the financing of the service contract and the negative equity eliminated Ford Motor Credit's purchase money security interest, and therefore, Ford Motor

Credit's claim is subject to a cram-down[1] under 11 U.S.C. § 506.[2]  The Court determines that

Ford Motor Credit's entire claim,[3] including that portion of the claim attributable to negative

equity and costs associated with the purchase of the vehicle, qualifies as a purchase money

security interest.  Accordingly, the hanging paragraph of §1325(a) applies, and the Debtor cannot

"cram down" Ford Motor Credit's claim pursuant to §506.  Therefore, the Debtor's objection to

Ford Motor Credit's claim is overruled and the proposed plan is denied confirmation for failure

to comply with §1325(a).

## I.      BACKGROUND

Debtor, Darin L. Burt, filed a petition under Chapter 13 on July 13, 2007.  On December

31, 2005, the Debtor purchased a 2006 Ford F-150 pickup truck for his personal use from

LaPoint Automotive LLC ("LaPoint").  LaPoint financed the transaction through a Utah Simple

Interest Retail Installment Contract (the "Contract").  Under the Contract, LaPoint retained a

purchase money security interest ("PMSI") in the Truck.  LaPoint later assigned its interest in

the Truck to Ford Motor Credit, which perfected its security interest by notation on the Truck's

title as required by the Utah Motor Vehicle Act.[4]

---

[1]      A "cram down" is the process by which the debtor is able to retain the collateral over the creditor's objection to the proposed chapter 13 plan.  The debtor does this by bifurcating the creditor's secured claim under § 506 and paying the secured portion at the value of the collateral, rather than the actual amount owed, with the difference then being treated as an unsecured claim.  *See Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 957 (1997).

[2]      All future statutory references are to title 11 of the United States Code unless otherwise indicated.

[3]      At the hearing on Ford Motor Credit's objection to confirmation, Ford Motor Credit indicated that it was withdrawing its claim to gap insurance and service contract as part of the purchase price.  Ford Motor Credit indicated that it will amend its proof of claim to reflect this modification.  Therefore, any reference to Ford Motor Credit's "entire claim" should be understood to exclude the amounts attributable to the gap insurance and service contract.

[4]      Utah Code. Ann. § 41-1a-101 (2006) et seq.

The Contract indicates that the cash price of the Truck was $32,630 and the total amount financed was $45,628.14. The difference between the two amounts included charges of $2,425 for a service contract, $500 for gap insurance, $298 for document preparation fee, $1,149.46 for tax and license fees, and $11,021.68 to pay off the obligation owed on a trade-in vehicle (2004 Ford F-150). The negative equity rolled into the transaction therefore is the $11,021.68 payoff less the Debtor's down payment of $1,800 and the manufacturer's rebate of $3,000, yielding a net negative equity[5] of $6,221. The evidence before the Court shows that because of the Debtor's marginal credit the Debtor was required to trade-in his 2004 Ford F-150 in order to qualify for financing on the new vehicle. Furthermore, the evidence demonstrates that the Dealer would not have financed the purchase had the Debtor not agreed to all the terms of the Contract, including the refinancing of negative equity.

On August 30, 2007, Ford Motor Credit filed a proof of secured claim for its security interest in the Truck in the amount of $42,941.64.[6] Debtor filed his chapter 13 plan (the "Plan")

---

[5] Negative equity results when a debtor trades in a vehicle that is "under water," meaning the trade-in vehicle has more debt against it than its value.

[6] The Debtor has objected to Ford Motor Credit's proof of claim, arguing that the amount listed in the proof of claim is difference than what the Debtor owes under the Contract. Debtor asserts that Ford Motor Credit should be required to account for the extra $3,778.32 included in the Amount Financed portion of the Contract as this extra amount is not disclosed in the Itemization of Amount Financed portion of the Contract. Debtor claims that the cash price of $35,029 in the Contract should be adjusted by deducting the manufacturer's rebate of $3,000 and the Debtor's down payment of $1,800, and adding the negative equity amount of $1,021, to produce an Unpaid Cash Balance of $31,250.68. Debtor alleges that the total amount financed should only be $41,849.82 not $45.628.14 as noted on the Contract. Ford Motor Credit responded to Debtor's objection, asserting that the amounts listed in the Contract are accurate. Specifically, Ford Motor Credit claims that the Buyer's Order shows a trade-in allowance of $20,000 which was used to offset the balance owing on the trade-in vehicle of $31,021.68, leaving an initial negative equity of $11,021.68. Ford Motor Credit asserts that the Debtor's down payment of $1,800 and the manufacturer's rebate of $3,000 were properly applied to the initial negative equity, yielding a negative equity balance of $6,221.68. This amount was clearly identified as "negative equity" under the Itemization of Amount Financed in the Contract. Ford Motor Credit also claims that the Debtor is misreading the gross negative equity balance as $1,021.48 when it was $11,021.68. Because of the negative value of the trade-in vehicle, Ford Motor Credit notes that the cash price and the unpaid balance of cash price are the same at $35,029. The Court has reviewed the Contract and finds that the amounts listed in the creditor's proof of claim are properly accounted for and accurately reflect the amounts owed under the Contract.

on July 25, 2007, which proposes to bifurcate Ford Motor Credit's claim into a secured portion

in the amount of $28,000 and an unsecured portion in the amount of the negative equity paid off

by the financing transaction.  Ford Motor Credit objected to confirmation of the Debtor's plan on

August 14, 2007, arguing that its entire claim qualified for treatment under the hanging

paragraph of § 1325(a) and could not be bifurcated under § 506(a).

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. § 157(b)(2)(L).  Venue is

appropriate under 28 U.S.C. § 1408(1).

## III.   ANALYSIS

In order to obtain confirmation of a Chapter 13 plan, the debtor must comply with

provisions of 11 U.S.C. § 1325(a).  Sections 506(a)(1) and 1325(a)(5) provide for the required

treatment of secured creditors.  Prior to the enactment of the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 (BAPCPA), sections 506(a)(1) and 1325(a)(5)(B) allowed a

Chapter 13 debtor to bifurcate an under-secured creditor's claim into secured and unsecured

portions, with the result that a creditor's claim was allowed as secured only to the extent of the

value of the collateral securing its debt.[7]  The portion of the creditor's claim allowed as secured

would be paid in full with interest, whereas the unsecured portion of the claim would be paid

pro-rata with all other general unsecured claims.[8]  This process of bifurcation is often referred to

as "cram-down."[9]  BAPCPA, however, amended § 1325 to give special protection to creditors

---

[7]    *In re Murray*, 346 B.R. 237, 241 (Bankr. M.D. Ga 2006).

[8]    11 U.S.C. § 506(a)(1).

[9]    *In re Pajot*, 371 B.R. 139, 146 (Bankr. E.D. Va. 2007); *Murray*, 346 B.R. at 241.

who finance automobile transactions that occur within 910 days prior to the debtors' filing for

Chapter 13 relief.[10]

Under BAPCPA, Congress added the "hanging paragraph"[11] after § 1325(a)(9), which

prevents the bifurcation of certain secured claims.  Specifically, the hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that
> paragraph if the creditor has a purchase money security interest securing the debt that is
> the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date
> of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as
> defined in section 30102 of title 49) acquired for the personal use of the debtor, or if
> collateral for that debt consists of any other thing of value, if the debt was incurred
> during the 1-year period preceding that filing.[12]

Thus, in order to avoid a cram-down, four conditions must be satisfied: (1) the creditor

has a purchase money security interest (PMSI); (2) the debt was incurred within 910 days

preceding the filing of the petition; (3) the collateral for the debt is a motor vehicle; and (4) the

motor vehicle was acquire for the personal use of the debtor.[13]  If these requirements are

satisfied, "then the creditor's claim is deemed fully secured" and cannot be bifurcated.[14]  The

parties do not dispute that the collateral in this case was a motor vehicle, purchased within 910

days of the debtor's petition, or that it was acquired for personal use.  The only requirement that

is in dispute is whether Ford Motor Credit's debt is secured by a purchase money security

---

[10]     *Gen. Motors Acceptance Corp. v. Peaselee*, 373 B.R. 252, 256 (W.D.N.Y.) (hereinafter "*Peaslee II*").

[11]     It is commonly referred to as the "hanging paragraph" because it follows the numbered subsections
of § 1325(a) but has no numerical designation of its own.

[12]     11 U.S.C. § 1325(a)(*).

[13]     *Peaslee II*, 373 B.R. at 257; *In re Acaya*, 369 B.R. 564, 567 (Bankr. N.D. Cal. 2007).

[14]     *Peaslee II*, 373 B.R. at 257 (citing *In re Belcher*, ___ B.R. ___, 2007 WL 1639342, at *3 (Bankr.
E.D. Ark. 2007).

interest.  To determine this issue, the Court must first decide whether the negative equity from

the trade-in vehicle that was rolled into the financing for the Truck as well as the other costs

associated with the purchase constitute a purchase money security interest as defined under Utah

law.[15]

### A.  Whether Ford Motor Credit Holds a PMSI Securing Its Debt, Including the Negative Equity on the Trade-in Vehicle and the Other Transaction Costs

In order to address the effect of the hanging paragraph, the Court must first determine the

extent to which Ford Motor Credit's security interest is a purchase money security interest.[16]

The term "purchase money security interest" as used in the hanging paragraph, is not defined in

the Bankruptcy Code.[17]  Therefore, courts uniformly refer to state law, and specifically to the

state's version of the Uniform Commercial Code ("UCC"), to determine whether a creditor holds

a purchase money security interest.[18]  The applicable statute in Utah is the Utah Code Annotated

§ 70A-9a-103(2), which provides that "[a] security interest in goods is a purchase-money

---

[15]    Both parties suggest in their briefs that since the term "purchase money security interest" is not defined in the Bankruptcy Code, the Court should look to Utah law, specifically Article 9 of the UCC, to determine the definition of the term.  However, Ford Motor Credit argues that in addition to the UCC the Court should also consider the Federal Truth in Lending Act's ("TILA") definition of "total sales price" as support for including negative equity in the purchase money security interest.  The Debtor disagrees, noting that "total sales price" as defined by TILA has no bearing on the definition of PMSI because it is only a disclosure statute that requires creditors extending financing to consumers to disclose the costs of the credit.  The Court is persuaded by the Debtor's argument and finds that UCC, and not TILA, is the relevant statute for determining whether Ford Motor Credit's interest qualifies as a purchase money security interest.

[16]    *In re Pajot*, 371 B.R. 139, 147 (Bankr. E.D. Va. 2007).

[17]    *See id.*; *Peaslee II*, 373 B.R. at 257; *In re* Cohrs, 373 B.R. 107, 109 (Bankr. E.D. Cal. 2007); *In re Graupner*, 356 B.R. 907, 911 (Bankr. M.D. Ga. 2006), *aff'd, Graupner v. Nuvell Credit Corp.*, 2007 WL 1858291 (M.D. Ga. June 26, 2007); In *re Price*, 363 B.R. 734, 740 (Bankr. E.D.N.C. 2007); *In re Pajot*, 371 B.R. 139, 147 (E.D. Va. 2007).

[18]    *See, e.g., Graupner*, 356 B.R. at 911 ("whether a creditor holds a purchase money security interest is a matter of state law"); *accord Peasley II*, 373 B.R. at 257; *Pajot*, 371 B.R. at 147; *Price*, 363 B.R. at 740; *In re Acaya*, 369 B.R. 564, 567 (Bankr. N.D. Cal. 2007); *Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. 36, 45 (D. Kan. 2007).

security interest . . . to the extent that the goods are a purchase-money collateral with respect to that security interest. . . ."  "Purchase-money collateral" is defined as "goods . . . that secures a purchase-money obligation incurred with respect to that collateral,"[19] and "purchase-money obligation" is defined as "an obligation of an obligor incurred as all or part of the *price of the collateral* or for *value given to enable* the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[20]

Whether a PMSI exists in this case, then, "turns on whether the negative equity on the debtor's trade-in vehicle constitutes 'part of the price of the collateral,' *i.e.* part of the price of the new vehicle, or whether it constitutes 'value given to enable the debtor to acquire rights in or the use of the collateral . . . .'"[21]  Although § 70A-9a-103 does not define the terms "price" or "value given," Comment 3 to § 70A-9a-103 states that "the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales, taxes, duties, finance charges, interest freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations."[22]

Both parties in this case agree that the definition of "purchase money security interest" as set forth in § 70A-9a-103 should control.  They disagree, however, on whether the negative equity from the debtor's trade-in vehicle that was rolled into the financing transaction for the

---

[19]   UTAH CODE ANN. § 70A-9a-103(1)(a).

[20]   UTAH CODE ANN. § 70A-9a-103(1)(b) (emphasis added).

[21]   *Peaslee II*, 373 B.R. at 258.

[22]   UTAH CODE ANN. § 70A-9a-103 cmt. 3.

Truck constitutes a purchase-money security interest.  The Debtor argues that the negative equity

on the Debtor's trade-in is neither part of the "price" of the new vehicle nor the "value given to

enable" the Debtor to acquire rights in the vehicle.  The Debtor further argues that refinancing of

"antecedent debt" is not included in the list of expenses enumerated in Comment 3, nor is it an

obligation similar to those provided in that list.  The Debtor also contends that Ford's acceptance

of the trade-in vehicle on the condition that the negative equity be paid off, and Ford's

willingness to extend the funds to do so, does not make it an "expense incurred" to acquire rights

in the new vehicle.  Ford Motor Credit, on the other hand, argues that the negative equity from

the Debtor's trade-in vehicle clearly falls within both categories of the definition of a purchase

money security interest.

A number of courts throughout the county have recently interpreted the effect of the

hanging paragraph exception on motor vehicle financing transactions that include negative

equity.[23]  However, no clear consensus amongst the courts has yet emerged on this issue.[24]  The

Court believes that a summary of the most relevant decisions would be helpful.

One line of cases, which include the bankruptcy court decisions in *Peaslee*, *Price*, *Acaya*,

*Barnes*, and *Pajot*, hold that negative equity is not part of the purchase price of the collateral, and

---

[23]    *See, e.g., In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2006), *rev'd, Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007) (hereinafter "*Peaslee I*"); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007); *In re Barnes*, ___ B.R. ___, Case No. 13-06-11169 (Bankr. D.N.M. Apr. 6, 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007); *Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. 36 (D. Kan. 2007); *Graupner v. Nuvell Credit Corp.*, No. 4:07-CV-37, 2007 WL 1858291 (M.D. Ga. June 26, 2007) (slip opinion); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y 2007); *In re Cohrs*, 373 B.R. 107 (Bankr. E.D. Cal. 2007).

[24]    *Peaslee II*, 373 B.R. at 255.

8

therefore, does not give rise to a purchase money security interest.[25]  In *Peaslee*,[26] a secured

creditor objected to confirmation of the debtor's Chapter 13 plan that provided for bifurcation of

creditor's claim secured by the debtor's 2004 Pontiac Grand Am.[27]  The car was purchased

within 910 days preceding bankruptcy, the creditor allegedly had a purchase money security

interest in the vehicle, which was acquired for personal use.  The debtor's plan proposed to cram

down the creditor's claim to $10,950, which was the value of the vehicle, and to give the creditor

an unsecured claim for the balance.  The creditor objected to this treatment, arguing that the

entire amount of its claim should be allowed as a secured, purchase money security interest.  The

Chapter 13 Trustee, however, filed a valuation motion asserting that only a portion of the

creditor's claim should be allowed as a secured claim because the amount financed included

$5,980 of rolled-in negative equity from the debtor's trade-in vehicle.

     The bankruptcy court rejected the creditor's objection and held that the creditor did not

have a purchase money security in that portion of the amount financed that was used to pay off

the negative equity on the debtor's trade-in vehicle.[28]  In reaching this conclusion, the Court

looked to the New York version of the UCC, which defines a purchase money security interest as

"an obligation of an obligor incurred as . . . part of the *price* of the collateral or for *value given* to

---

[25]    *Peaslee I*, 358 B.R. at 558; *In re Acaya*, 369 B.R. at 570; *Citifinancial Auto*, 369 B.R. at 45; *In re Barnes*, Case No. 13-06-11169 at 4-5; *In re Pajot*, 371 B.R. at 147.

[26]    The District Court for the Western District of New York recently reversed the bankruptcy court and overruled *Peaslee I* in an appeal which consolidated several individual cases with common negative equity issues.

[27]    *Peaslee I*, 358 B.R. at 548.

[28]    *Id.* at 554.

9

enable the debtor to acquire rights in . . . the collateral."[29]  The Court concluded that neither the

"price" nor the "value given to enable" prongs of UCC § 9-103 covered negative equity.[30]  The

Court further explained that "the term 'enable' refers to what it has always referred to, which is

the value given to allow the debtor to pay . . . the actual price of . . . the replacement vehicle,"

not additional sums.[31]  The Court, therefore, ruled that refinancing of negative equity as part of

the replacement vehicle's purchase did not result in a purchase money security interest under

New York law.  The Court viewed the financing of the new car and the refinancing of negative

equity on the debtor's trade-in as "simply two separate financial transactions memorialized on a

single retail installment contract . . . ."[32]  "However, the debt incurred in the separate optional

transaction where negative equity is refinanced as a part of the combined transaction does not

result in a purchase money obligation and the resulting security interest taken for that debt is not

a purchase money security interest."[33]  The Court then adopted the "transformation rule,"[34] and

concluded that based on that rule the creditor did not have a purchase money security interest in

the debtor's vehicle in any amount, and therefore, the creditor's entire claim was subject to a

cram down.[35]

---

[29]     *Id.* at 556 (quoting U.C.C. § 9-103).

[30]     *Id.* at 557-58.

[31]     *Id.* at 557.

[32]     *Id.* at 558.

[33]     *Id.*

[34]     The "transformation rule" provides that when a transaction contains both purchase money and non-purchase money obligations, the entire transaction is transformed into a non-purchase money transaction.

[35]     *Peaslee I*, 358 B.R. at 560.

Similarly, in *Price* the debtors' Chapter 13 plan proposed to bifurcate a secured creditor's claim into a secured claim to the extent of the value of the vehicle, which the debtors valued at $12,475, and an unsecured claim for the balance.  The creditor, Wells Fargo, objected to confirmation of the debtors' plan, asserting that it held a purchase money security interest in the debtors' 2001 Lincoln LS, which was acquired within 910 days preceding bankruptcy, and that the hanging paragraph precluded the bifurcation of its secured claim.[36]  The debtors disagreed, arguing that the creditor did not have a purchase money security interest because the amount of its claim included obligations separate from, and in addition, to the purchase price of the vehicle. The bankruptcy court denied Wells Fargo's objection to confirmation of the plan, and held that the money advanced to pay the cost of the gap insurance was not part of the purchase price of the vehicle, and therefore, did not constitute a purchase money security interest.[37]  The Court further held that the funds advanced to payoff the negative equity on the debtors' trade-in vehicle were not part of the purchase price and did not give rise to purchase money security interest.[38] Consequently, the Court held that Wells Fargo did not have a purchase money security interest for the full amount of its claim.[39]  The Court relied on North Carolina's version of the UCC, stating "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and

---

[36]     *Price*, 363 B.R. at 737-38.

[37]     *Id.* at 741.

[38]     *Id.*

[39]     *Id.* at 742.

11

subsequently creates the security interest to secure the purchase price."[40]  The Court further

stated that "[i]f Congress intended the hanging paragraph to provide for the disparate treatment

of a claim that is only partially secured by a purchase money security interest, it could easily

have done so as it had in other sections of the Code."[41]  The Court then considered whether to

apply the dual status rule or the transformation rule, and held that "when negative equity is

involved, the appropriate rule is the transformation rule."[42]  The Court concluded that pursuant to

the transformation rule, Wells Fargo's claim was not secured by a purchase money security

interest in any amount, and therefore, could be crammed down to the value of the collateral.[43]

   In contrast, the district court decisions in *Peaslee II* and *Graupner*, and the bankruptcy

court decisions in *Petrocci* and *Cohrs*, hold that the definition of purchase money security

interest includes negative equity rolled into a new motor vehicle financing transaction.[44]  In

*Peaslee II*, the district court, on appeal, considered "the extent to which a creditor [held] a

purchase money security interest in connection with a motor vehicle sale in which the seller

allow[ed] the buyer to 'roll in' the 'negative equity' on a trade-in vehicle. . . ."[45]  In reversing the

bankruptcy court decision, the district court held that the creditor's entire claim, including the

portion attributable to the negative equity on the debtor's trade-in vehicle, should be treated as a

---

[40]   *Id*. at 740-41 (citing to N.C. GEN. STAT. § 25-9-103 (2005) & cmt. 3).

[41]   *Id.* at 743.

[42]   *Price*, 363 B.R. at 746.

[43]   *Id.*

[44]   *Peaslee II*, 373 B.R. at 259-60; *Graupner*, 356 B.R. at 923; *Petrocci*, 370 B.R. at 501; *Cohrs*, 373 B.R. at 110-11.

[45]   *Peaslee II*, 373 B.R. at 255.

12

secured claim.[46]  The Court focused on the definition of purchase-money security interest in

UCC § 9-103 and Comment 3, and found that both the "price" of the collateral and the "value

given" prongs covered negative equity.  The Court further noted that the payoff of the negative

equity was precisely the type of "expense incurred in connection with acquiring rights in the

collateral" contemplated by Comment 3.  The Court explained that the items included in

Comment 3 (sales taxes, duties, etc.) are not listed as examples of "expenses" incurred in

connection with purchasing a vehicle but as "*additional* components of the 'price' of the

collateral or of 'value given' by the debtor."[47]  Therefore, "it would be difficult" to see how

refinancing of rolled-in negative equity "could *not* be viewed as . . . an expense" incurred in

connection with acquiring rights in the new vehicle.[48]  The Court then considered the second part

of Comment 3, which states that "[t]he concept of 'purchase-money security interest' requires a

close nexus between the acquisition of collateral and the secured obligation."[49]  The Court held

that "[w]here the parties to the transaction agree to a 'package transaction' in which the negative

equity is inextricably intertwined with the sales transaction and the financing of the purchase,

one could certainly conclude that this close nexus between the negative equity and this package

transaction supports the conclusion that the negative equity must be considered as part of the

price of the collateral."[50]  The Court then considered the New York Motor Vehicle Retail

Installment Sales Act's definition of "cash sales price," which includes negative equity, as

---

[46]     *Id.* at 262.

[47]     *Id*. at 258.

[48]     *Id*.

[49]     *Id.* at 259.

[50]     *Id*. (quoting *Graupner*, 2007 WL 1858291, at *2) (internal quotations omitted).

additional support for concluding that negative equity was entitled to a purchase money security interest.[51]

In *Graupner*, the secured creditor objected to confirmation of the debtor's Chapter 13 plan where the secured claim in a 2005 Chevrolet Silverado would be bifurcated into secured and unsecured portions and crammed down.  At issue was whether the creditor retained a purchase-money security interest within the meaning of § 1325(a)(*), when the total amount financed as part of the debtor's purchase of the new vehicle included negative equity from a trade-in vehicle.[52]  Relying on § 11-9-103 of the Georgia Code, the Court concluded that "the price of the collateral" as defined in Comment 3 included negative equity.[53]  The Court noted that the trade-in of the vehicle was "an integral part of the sales transaction," and that "the value of that trade-in along with its accompanying debt affected the ultimate price that was paid for the new [vehicle]."[54]  Because of the "close nexus" between the negative equity and the financing of the new vehicle, the Court concluded that negative equity had to be considered a part of the price of the collateral.[55]  The Court, therefore, affirmed the bankruptcy court's decision that the

---

[51]     *Id*. at 2560.

[52]     *Graupner*, 2007 WL 1858291, at *1.

[53]     *Id*. at *2.

[54]     *Id. See also Petrocci*, 370 B.R. at 499 (holding that "[t]his negative equity financing is inextricably linked to the financing of the new car" because "[i]t is clear that one would not take place without the other."); *Murray*, 346 B.R. at 240 (concluding that the financing of an extended service contract and the documentary fee "did not prevent a creditor from taking a purchase-money security interest in the . . . vehicle" since "there is no requirement in § 1325(a)(*) that a creditor be secured *only* by a motor vehicle.").

[55]     *Graupner*, 2007 WL 1858291, at *2.

14

creditor had a purchase money security interest for the full amount of its debt and its claim could not be bifurcated under § 506.[56]

In *Cohrs*, as in the present case, the debtor's plan proposed to cram down the creditor's secured claim in the debtor's truck, which was purchased within 910 days of debtor's bankruptcy filing.[57]  The creditor objected to the confirmation of the debtor's plan, arguing that the hanging paragraph prevented the debtor from cramming down its secured claim to the value of the truck. The debtor argued that the hanging paragraph did not apply to prevent bifurcation of the creditor's claim, because the inclusion of the negative equity with the purchase price of the truck destroyed the purchase money security character of the creditor's interest.  The Court rejected the debtor's argument, and held that the creditor retained a purchase money security interest in the entire transaction even though part of the amount financed was used to payoff the negative equity on the debtor's trade-in vehicle.  Relying on California's version of UCC § 9-103, the Court explained that the term "value given to enable the debtor to acquire rights in the collateral" used in the definition of PMSI is broad enough to include negative equity.[58]  Specifically, the Court noted that "[w]hen a car buyer offers to trade in a vehicle as part of the purchase price for another vehicle, the charges incidental to transferring the trade-in vehicle are part of the purchase price of the new vehicle," and are "incurred to 'enable the debtor to acquire rights' in the new vehicle."[59]  Therefore, when a creditor "finances the purchase of a new vehicle and, as part of the

---

[56]    *Id.*

[57]    *Cohrs*, 373 B.R. at 108.

[58]    *Id*. at 109.

[59]    *Id.* at 109-10.

transaction also pays off [the negative equity] on the trade-in vehicle, the loan extended is a purchase money obligation of the buyer, the new vehicle is purchase money collateral, and the lender's security interest is a purchase money security interest."[60]  As a result, the lender's claim is protected by the hanging paragraph and cannot be crammed down to the value of the vehicle.

This Court is persuaded by the decisions in *Peaslee II*, *Graupner*, *Petrocci* and *Cohrs*, that the negative equity and the other costs related to the purchase of the collateral, where required by the lender, should be included in the purchase money security interest of a secured creditor.  The Court believes that this interpretation is consistent with the plain language of the Bankruptcy Code as amended by the BAPCPA, and with the applicable provisions of the UCC as adopted in Utah.  Specifically, the Court finds that § 1325(a)(*), otherwise referred to as the hanging paragraph, prohibits the cram down of a secured creditor's claim where negative equity on the debtor's trade-in vehicle is financed together with the cash price of the new vehicle and other transaction costs.

The Court further finds that because the term "purchase-money security interest" used in the hanging paragraph is not defined in the Bankruptcy Code, the Court must look to Utah's version of the Uniform Commercial Code.  The Court believes that Utah's Uniform Commercial Code, Utah Code Ann. § 70A-9a-103, is identical to the New York, Georgia, and California statutes defining purchase money security interest as cited in *Peaslee II*, *Graupner* and *Cohrs* respectively.  Like in *Peaslee II, Graupner*, and *Cohrs*, this Court determines that the terms "price" and "value given to enable" as defined in  § 70A-9a-103 should be interpreted broadly to include negative equity from the debtor's trade-in vehicle and other transaction costs connected

---

[60]      *Id.* at 110.

to the purchase of the debtor's Truck.  The Court is not persuaded that the term "price of the collateral" as used in UCC § 9-103 should be limited to the "actual price" or the sticker price of the new vehicle.

The Court's position is further reinforced by the language of the Official Comment 3 to § 70A-9a-103, which states that the "price" of the collateral as it is used in the definition of PMSI includes much more than "the actual price of the collateral being acquired."[61]  Specifically, Comment 3 states that the "price of the collateral" or "value given to enable" includes "obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges . . . and other similar obligations."  Like the courts in *Peaslee II* and *Cohrs*, the Court believes that this list is not exhaustive and the expenses identified in Comment 3 are merely examples or additional components of the "price of the collateral" or of "value given" by the debtor.[62]  Therefore, just as the courts in *Peaslee II*, *Cohrs*, and *Petrocci*, this Court cannot see how the refinancing of negative equity and the other transaction costs incurred in connection with the purchase of the debtor's new truck could not qualify as an "expense" within the meaning of Comment 3.

The reasoning in *Peaslee II* is persuasive where the Court states that "[i]f the buyer and seller agree to include the payoff of the outstanding balance on a trade-in [and the other transaction costs] as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how [these] could *not* be viewed as such an expense."[63]  The debtor and the

---

[61]  *See Petrocci*, 370 B.R. at 498-99 (citing and distinguishing *Peaslee*, 358 B.R. at 556).

[62]  *Peaslee II*, 373 B.R. at 258; *Cohrs*, 373 B.R. at 109.

[63]  *Peaslee II*, 373 B.R. at 259.

dealer in this case agreed that as part of the purchase of the Truck and pursuant to the retail

installment contract, the dealer would advance funds to payoff the lien on the debtor's trade-in

vehicle and to cover tax, license and document preparation fees.  Essentially, this was a package

deal.  Ford Motor Credit later stepped into the purchase-money lender shoes of the dealer.  The

Court concludes that the agreement and the dealings between the debtor and the dealer/creditor

demonstrate that the costs of satisfying these outstanding obligations of the debtor were clearly

incurred in connection with the purchase of the new vehicle.

Additionally, Comment 3 states that "'[t]he concept of 'purchase money security interest'

requires a close nexus between the acquisition of the collateral and the secured obligation."[64]

The courts in *Peaslee II*, *Graupner*, *Cohrs* and *Petrocci* have interpreted this requirement to

mean that where the parties to the transaction agree to a package deal in which negative equity is

"inextricably intertwined" with the sales transaction and the financing of the purchase, this close

nexus between the negative equity and the package transaction supports the conclusion that

negative equity is part of the price of the collateral.[65]

The Court finds that in the present case, there is a very close connection between the

negative equity and the financing of the Debtor's new vehicle.  As noted earlier, the financing

transaction was a package deal where the negative equity in the trade-in was paid off by the

dealer as part of its retail installment sale of the new vehicle and the related obligation was

included in the Contract with the Debtor.   All of the amounts financed in the contract, except the

gap insurance and service contract, were directly connected to the Debtor's purchase of the new

---

[64]     UTAH CODE ANN. § 70A-9A-103 cmt. 3.

[65]     *Peaslee II*, 373 B.R. at 259 (citing *Graupner*, 2007 WL 1858291, at *2, *Cohrs*, 2007 WL
2186135, at *2, and *Petrocci*, 2007 WL 1813217, at *9).

vehicle.  In fact, the evidence before this Court shows that Ford Motor Credit would not have

financed the total purchase price had the Debtor not agreed to all of the terms of the Contract

including the negative equity and the add-on transaction costs.  The Court, therefore, concludes

that because of this close nexus between the negative equity and the financing of the Debtor's

new vehicle, the entire transaction qualifies as a purchase money security interest.

Accordingly, Ford Motor Credit's entire claim including that portion of the claim

attributable to the payoff of negative equity on the Debtor's trade-in vehicle and the other

transaction costs, should be allowed as a fully secured claim that must be paid in full through the

Debtor's chapter 13 plan.

**B.**     **The Use of the Loan Proceeds to Refinance the Negative Equity on the
Debtor's Trade-in Vehicle and to Payoff Transaction Costs Associated with
the Purchase of the New Vehicle Does not Destroy Ford Motor Credit's
Purchase Money Security Interest**

The Debtor argues that since the transaction granting security interest included debt other

than that incurred for the cash price of the new vehicle, the protection under the hanging

paragraph does not apply to any element of financing.  Therefore, the Debtor argues that Ford

Motor Credit's entire claim is subject to cram down and bifurcation under § 506.  In response,

Ford Motor Credit argues that it holds a purchase money security interest in the entire amount of

the debt, including the negative equity and the other charges financed as part of the purchase of

the Debtor's new vehicle.

The arguments advanced in this case appear to be similar to those advanced by the parties

in *In re Ericksen*,[66] decided by this Court in July 26, 2006.  The debtors in that case, like the

---

[66]     *In re Ericksen*, 06-20572 (Bankr. D. Utah July 26, 2006) (Thurman, J.).

Debtor here, argued that because they used the loan proceeds to pay for other charges, such as

taxes and insurance policy, the creditor could not have a purchase money security interest in the

vehicle.  In making these arguments, the debtors' relied on the "transformation rule" followed in

some jurisdictions that states that purchase money status is destroyed where the collateral

secures more than its price.[67]  In essence, when the loan proceeds are used to acquire both

purchase money and non-purchase money collateral, the entire security interest is transformed

into a non-purchase money security interest.  The creditor, like Ford Motor Credit, argued that

the "dual status rule" applied.  The dual status rule "allows a security interest to have both the

status of a purchase money security interest, to the extent that it is secured by collateral

purchased with loan proceeds, and the status of a general security interest, to the extent that the

collateral secures obligations unrelated to its purchase."[68]  Essentially, under this rule, purchase

money status is not destroyed when collateral secures more than its price.  Rather a purchase

money security interest exists to the extent that loan proceeds were used to purchase the

collateral.[69]

        After a detailed analysis of both rules, this Court rejected the "transformation rule" and

held that the "dual status rule applied."  In applying the "dual status rule" to the facts of that

case, the Court concluded that the amounts advanced to pay for sales and property taxes, the

document preparation fee, and the credit report fees, qualified as part of the "price of the

---

[67]      *See Billings v. Avco Colo. Indus. Bank (In re Billings)*, 838 F.2d 405, 407 (10th Cir. 1988)
(summarizing those courts that have followed the transformation rule).

[68]      *Petrocci*, 370 B.R. at 504 (citing *In re Ionosphere Clubs, Inc.*, 123 B.R. 166, 172 (S.D.N.Y.
1991)).

[69]      *Ericksen*, 06-20572 at *6.

collateral," and were part of the creditor's purchase money security interest.[70]  The creditor, however, did not have a purchase money security interest to the extent that the loan proceeds were used to purchase the insurance policy.[71]

The Court determines that, contrary to the Debtor's assertion, the transactions in question are not mixed but are entirely purchase money obligations as defined in § 70A-9a-103.  As noted earlier in this Decision, the transaction with the Debtor was a package deal that included the purchase and financing of taxes, documentary fees and negative equity, all of which were necessary to complete the transaction.  Furthermore, the courts that have addressed the issue of whether the financing of a service contract and other fees prevents application of the hanging paragraph have held that the inclusion of these additional costs in the financing transaction did not prevent the creditor from taking a purchase money security interest in the new vehicle.[72]

Even if the Court were to find some support for the Debtor's argument, the Court determines that under the dual status rule as adopted by this Court in *Ericksen*, Ford Motor Credit's entire claim qualifies as a purchase money security interest and cannot be crammed down.  Specifically, as in *Ericksen*, the Court here finds that the amounts advanced to pay for taxes, the document preparation fee, and the negative equity on the Debtor's trade-in vehicle, fall within the definition of the "price" of the vehicle or "value given to enable" the Debtor to purchase the vehicle.  As a result, because all of these expenses were necessary to complete the transaction, they are part of Ford Motor Credit's purchase money security interest and are

---

[70]    *Id.* at 8.

[71]    *Id.*

[72]    *Murray*, 346 B.R. at  240; *In re Johnson*, 337 B.R. 269 (Bankr. M.D.N.C. 2006).

21

protected under the hanging paragraph.[73]  Accordingly, even if the Court were to apply the dual

status rule in this case, the purchase money portion of Ford Motor Credit's claim (which is the

entire amount) is protected from cram down.

### C.      Applicable Interest Rate

One issue raised by the parties during the confirmation hearing was the appropriate

interest rate to be paid should the Court conclude that Ford Motor Credit's claim is an "allowed

secured claim."  Although this issue was not argued by the parties, nor was it addressed in their

briefs, the Court believes that the applicable interest rate will be the current market interest rate

as determined by the United States Supreme Court in *Till v. SCS Credit Corp.*[74]  However, since

the issue was not argued, nor facts presented to support it, the Court need not address it further.

## IV.    CONCLUSION

For the above reasons, Ford Motor Credit's objection to confirmation is sustained, the

Debtor's objection to Ford Motor Credit's claim is overruled, and the Plan is denied

confirmation without prejudice for failure to comply with § 1325(a).  The Debtor may submit a

new plan consistent with this opinion.  An order will be issued contemporaneously herewith.


_____END OF DOCUMENT_____

---

[73]      *Ericksen*, 06-20572 at *7-8.

[74]      541 U.S. 465 (2004).

22

_____ooo0ooo_____

**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

| | |
|---|---|
| Kevin R. Anderson | (Electronic Notice) |
| United States Trustee | (Electronic Notice) |
| Kim R. Wilson<br>Attorney for Ford Motor Credit Company, LLC | (Electronic Notice) |
| Ford Motor Credit Company, LLC<br>P.O. Box 17904<br>San Diego, CA 92177-7904 | (First Class Mail) |
| Lee J. Davis | (Electronic Notice) |

23